IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID NEY,                          )
                                    ) Civil Action
                    Plaintiff       ) No. 06-CV-4354
                                    )
        vs.                         )
                                    )
OPEN SOLUTIONS, INC.,               )
                                    )
                    Defendant[1]    )

                    *    *    *

APPEARANCES:

        MARK S. SIGMON, ESQUIRE
            On behalf of Plaintiff

        SCOTT L. VERNICK, ESQUIRE
        DAVID H. COLVIN, ESQUIRE and
        ADAM G. SILVERSTEIN, ESQUIRE
            On behalf of Defendant

                    *    *    *


                O P I N I O N

JAMES KNOLL GARDNER,
United States District Judge


        This matter is before the court on the Motion of

Defendant Open Solutions Inc. for Summary Judgement Under Federal

Rule of Civil Procedure 56(c) filed on July 13, 2007.[2]  For the

---

        [1]    Plaintiff's Complaint avers that defendant's corporate name is
"Open Solutions, Inc."  However, defendant identifies itself using the
corporate name "Open Solutions Inc."  Neither party disputes the identity of
the defendant.  Thus, I refer to defendant as Open Solutions Inc. throughout
the text of this opinion, but I do not alter the caption.

        [2]    Plaintiff's Answer in Opposition to the Defendant's Motion for
Summary Judgment was filed on July 27, 2007.  In the accompanying Order, I

(Footnote 2 continued):

reasons expressed below, I deny defendant's motion for summary judgment.

## JURISDICTION

Jurisdiction is based upon diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff David Ney is a natural person and is a citizen of the Commonwealth of Pennsylvania. Defendant Open Solutions Inc. is a Delaware corporation with its principal place of business in Connecticut.

## VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to plaintiff's claims allegedly occurred in Northampton County, Pennsylvania, which is located in this judicial district.

## PROCEDURAL HISTORY

Plaintiff David Ney commenced the within matter against defendant Open Solutions Inc. on September 1, 2006 by filing a Complaint with a demand for jury trial in the Court of Common Pleas of Northampton County, Pennsylvania (case number C004CV-2006-6961). The Complaint sets forth a single-count breach of contract claim based on defendant's sales commissions plans for

_____

(Continuation of footnote 2):

grant the Motion of Defendant Open Solutions Inc. for Leave to File a Reply Brief in Support of Open Solutions Inc.'s Motion Summary Judgment, which motion was filed August 29, 2007, and direct the Clerk of Court to file the Reply Memorandum of Law in Support of Motion of Defendant Open Solutions Inc. for Summary Judgment Under Federal Rule of Civil Procedure 56(c). Plaintiff's Answer in Opposition to Defendant's Motion for Leave to File Summary Judgment was filed on September 11, 2007.

the years 2004 and 2005.  Defendant timely removed the action on September 29, 2006.  See 28 U.S.C. §§ 1441 and 1446.

An arbitration was held on July 26, 2007 and an arbitration award was entered on July 26, 2007 by the Clerk of Court.  On July 30, 2007 defendant demanded a trial de novo pursuant to Rule 53.2(7)(A) of the Rules of Civil Procedure of the United States District Court for the Eastern District of Pennsylvania.

<u>UNDISPUTED FACTS</u>

<u>Background</u>

Based upon the Concise Statement of Undisputed Material Facts of Defendant Open Solutions Inc. filed on July 13, 2007, and Plaintiff's Answer in Response to the Defendant's Concise Statement of Undisputed Material Facts filed on July 27, 2007, the following facts are undisputed.  Plaintiff is a former employee of defendant Open Solutions Inc.  Defendant sells and licenses software and related services to financial institutions through a direct sales force.  Plaintiff was employed by defendant as an Area Vice President between July 2003 and January 2006, when plaintiff voluntarily resigned to work as an account executive with J&B Software located in Blue Bell, Pennsylvania.

From the time he graduated from college, plaintiff worked in the computer software industry in different capacities, including as a salesman.  In March 1997 plaintiff joined Liberty

-3-

FiTech as a District Sales manager.  Liberty FiTech sold computer software to financial institutions. Defendant remained at Liberty FiTech until it was acquired by defendant in June 2003. Defendant hired plaintiff as an Area Vice President in June 2003.

During plaintiff's employment by Liberty FiTech, plaintiff was paid a 50% commission upon the signing of a sales contract, and the remaining 50% when the customer "went live".[3] The Liberty FiTech compensation plans provided that no commission would be paid if the sales person was no longer employed at the time the commission was scheduled to be paid.  Thus, plaintiff would have forfeited the payment of any commissions in the event that he voluntarily resigned from his employment with Liberty FiTech.

During the calendar year 2004, plaintiff earned his commissions pursuant to the Open Solutions 2004 Vice President Sales Commission Plan ("2004 Plan").  During the calendar year 2005, plaintiff earned his commissions pursuant to the Open Solutions 2005 Area Vice President - Core Sales Commission Plan ("2005 Plan").  The 2005 Plan incorporated the Open Solutions Inc. Area Vice President 2005 Sales Commission Plan Terms and Conditions ("2005 Terms and Conditions").  Plaintiff signed the 2004 Plan, the 2005 Plan and the 2005 Terms and Conditions after

[3]     The term "went live" is utilized by both parties in this action as synonymous with the term "conversion", a term utilized in plaintiff's commission plans with both Liberty FiTech and Open Solutions Inc.

-4-

he had an opportunity to review these documents and ask questions about them.

Under both the 2004 and 2005 Plans, plaintiff earned his commissions under a two-step process.  Plaintiff would earn 50% of his commission upon the signing of a sales contract with a client.  Plaintiff would earn the remaining 50% when a client would convert.[4]

Plaintiff seeks the following sales commissions based upon sales commissions for customers who converted after the effective date of plaintiff's voluntary termination (the dollar amounts represent the 50% conversion commissions):

```
SRP Federal Credit Union                -  $6,650.51
Members Plus Credit Union               -  $7,483.16
South Carolina State Credit Union       - $31,265.78
Connects Federal Credit Union           - $11,994.82
DFCU Financial Federal Credit Union     - $55,425.83
SSA Baltimore FEDERAL Credit Union      - $18,107.49

TOTAL COMMISSIONS SOUGHT                  $130,927.59
```

Defendant paid plaintiff the purchase-order-agreement-signing commissions for each of the above customers.  However, defendant did not pay plaintiff the 50% commissions for the above sales with respect to which there were no conversions before the effective date of plaintiff's resignation.

---

[4]    "Conversion" is not defined in either the 2004 Plan, the 2005 Plan or the 2005 Terms and Conditions.  However, the parties use the term to mean that a client went online and began using the software program sold by Open Solutions Inc.  Neither party disputes the meaning of conversion.

-5-

<u>Terms of the 2004 Plan and 2005 Plan</u>

The 2004 Plan expressly provides that "Commissions will be paid as follows[:]...50% in the month following Agreement signing...[and] the remaining 50% the month following conversion....[P]ayment will be made to the respective Area Vice President on the 30th of each month following the earned activity."[5]

Similarly, the 2005 Plan provides that "Commissions on Core Sales, TOC products and SSG component sales will be calculated on the commissionable Agreement value as follows: ...50% upon signed Agreement...[and] 50% upon conversion. Commissions are paid one month in arrears (i.e., Commissions earned in January are paid out in February)."[6]

Regarding commission adjustments and timing of payments, the 2004 and 2005 Plans provide as follows:

Additional Commission Information:

> Commissions will be adjusted monthly for any credits granted or for any Agreement cancellations and/or credits granted on items under the control of the Area Vice President which reduce the commissioned amount.[7]

---

[5]     Exhibit A to the Memorandum of Law of Law in Support of Motion of Defendant Open Solutions Inc. for Summary Judgment Under Federal Rule of Civil Procedure 56(c) filed July 13, 2007 ("Exhibit A").

[6]     Exhibit B to the Memorandum of Law of Law in Support of Motion of Defendant Open Solutions Inc. for Summary Judgment Under Federal Rule of Civil Procedure 56(c) filed July 13, 2007("Exhibit B").

[7]     Exhibit A and Exhibit B.

With respect to an employee termination, the 2004 and 2005 Plans both state:

> If an Area Vice President's employment with Open Solutions is terminated, either voluntarily or involuntarily, all of the employee's closed orders as of their termination date will be reviewed for calculation of commission payments based on their status as of that date.  If there is any outstanding amount owed to Open Solutions, the commission due will be reduced by any such amount outstanding.  Only the amount due to be paid at termination will be paid.  No additional amounts will be paid after termination.[8]

However, the 2005 Plan contains an additional document, which states "See Terms & Conditions for details."[9]

<u>The 2005 Terms and Conditions</u>

The 2005 Terms and Conditions contains the following terms:

> The sums set forth in the Plan shall accrue to the Area Vice President as described herein, but such sums shall not be earned by, nor paid to, the Area Vice President unless and until all necessary conditions for such payment are fulfilled.  Necessary conditions shall include, without limitation, the full execution of non-cancelable Agreements as determined by Open Solutions in its absolute discretion, as well as any other conditions contained in this Plan, including, without limitation, continued employment with Open Solutions.
>
> * * *

**Receivables**

Open Solutions reserves the right to reverse

---

[8]     <u>Id.</u>

[9]     Exhibit B.

revenues for receivables more than 90 days past
due.  When those receivables are paid, the quota
attainment will be reinstated to the Area Vice
President's quota attainment.  Should any of these
receivables become Bad Debt, the associated amount
is subject to deduction from the Area Vice
President's quota attainment unless such bad debt
is collected....

When an Area Vice President ceases his or her
participation in the Plan for any reason (e.g.
promotion, transfer or voluntary departure), Open
Solutions will have no responsibility to pay
commissions on those revenues even if they are
subsequently collected.

**Change of Employment**

If the Area Vice President transfers to another
position in the company taking him or her outside
the Plan or leaves the company, the following
conditions will apply:

- Payment of commissions will be made for the
  Area Vice President's closed orders as of
  their effective transfer date or termination
  date.  Open Solutions reserves the right to
  charge back all sales aged over 90 days for
  commission purposes as of the employee's
  termination date or date of transfer to
  another position.

- Commission payments will be sent to former
  employee on the 30th of the month following
  the earned activity.

- If there is any outstanding amount owed to
  Open Solutions, the commission due will be
  reduced by any such amount outstanding.  Only
  the amount due to be paid at transfer or
  termination will be paid.  No additional
  amounts will be past [*sic*] after the transfer
  or termination date.

A final commission statement will be prepared at
the end of the month following the last full or
partial month employed by Open Solutions as a
participant of this Plan, and such statement will

include all amounts payable to the employee under
this Plan.  Any negative balances (dollars owed to
Open Solutions) that may exist in the Plan
participant's account will be fully recoverable to
the extent allowable hereunder.  Any commission
due to the employee will be paid as soon as monies
are collected from the client, but, if deemed
necessary by Open Solutions in its absolute
reasonable discretion, will be netted against
amounts recoverable from the former employee.[10]

CONTENTIONS OF THE PARTIES

Defendant's Contentions

Defendant Open Solutions Inc. contends that the

unambiguous language of the 2004 Plan, 2005 Plan and 2005 Terms

and Conditions establish that plaintiff is not entitled to

commissions on accounts which had not converted by the effective

date of plaintiff's termination.  Defendant asserts that

plaintiff only earned full 100% commissions on accounts which had

both signed agreements and converted prior to plaintiff's

resignation.  Thus, defendant argues the subsequent conversions

do not result in further commissions owed to plaintiff.

With regard to which contracts govern the claims for

commissions, defendant avers that the 2004 Plan and the 2005 Plan

(along with the 2005 Terms and Conditions) establish the

methodology by which plaintiff's commissions are calculated.

Defendant argues that the 2004 Plan solely governs plaintiff's

two claims for calendar year 2004 account commissions (the SRP

---

[10]     Exhibit C to the Memorandum of Law of Law in Support of Motion of
Defendant Open Solutions Inc. for Summary Judgment Under Federal Rule of Civil
Procedure 56(c) ("Exhibit C").

Federal Credit Union and Members Plus Credit Union).  Defendant also asserts that the 2005 Plan and 2005 Terms and Conditions govern the claims for commissions earned during the calendar year 2005.

Defendant contends that its construction of the 2004 Plan, 2005 Plan and 2005 Terms and Conditions is the only interpretation of the contracts which gives full effect to all terms.  Defendant argues that plaintiff's construction of the 2005 Terms and Conditions is internally inconsistent (with other provisions of the 2005 Terms and Conditions) as well as inconsistent with both the 2004 Plan and 2005 Plan.

Defendant contends the 2005 Terms and Conditions specifically refer to "continued employment with Open Solutions" as a "necessary condition" to receive commissions.  Defendant also points to language in the 2004 Plan and 2005 Plan which unequivocally states that "[o]nly the amount due to be paid at termination will be paid" based upon the status of "all of the employee's closed orders as of their termination date".

Applying this language, defendant contends that the "status" of the relevant accounts is undisputed.  The clients had signed sales contracts, but had not yet converted when plaintiff resigned.  Accordingly, defendant argues that plaintiff is not entitled to commissions which may have been earned as a result of subsequent status changes.

-10-

Defendant asserts that plaintiff has failed to offer any evidence in support of its interpretation that the contract is clear and unambiguous or that it contains an ambiguity. Specifically, defendant asserts that plaintiff's interpretation of the contractual language cannot be reconciled between the three relevant documents and plaintiff has offered no evidence to show an ambiguity. Moreover, defendant contends that it has never paid conversion commissions to an Area Vice President after his or her employment has terminated and that plaintiff has failed to offer any contradictory evidence.

<u>Plaintiff's Contentions</u>

Plaintiff disputes defendant's construction of the contract. Plaintiff argues that either (1) the 2005 Terms and Conditions document clearly and unambiguously entitles plaintiff to commissions on accounts which converted subsequent to plaintiff's termination, or (2) the 2005 Terms and Conditions are ambiguous, and that any ambiguities must be resolved by the trier of fact in plaintiff's favor.

With regard to which contracts govern the claims for commissions, plaintiff concedes that the 2004 Plan and the 2005 Plan (along with the 2005 Terms and Conditions) establish the methodology by which plaintiff's commissions are calculated. Plaintiff also agrees that the 2005 Plan and 2005 Terms and

-11-

Conditions govern the claims for commissions earned during the calendar year 2005.

However, plaintiff disputes defendant's contention regarding the operative documents for plaintiff's 2004 commission claims.  Plaintiff argues that the 2004 Plan was modified by the 2005 Plan and the 2005 Terms and Conditions, and the three documents together govern plaintiff's two claims for calendar year 2004 account commissions (the SRP Federal Credit Union and Members Plus Credit Union).

Plaintiff concedes that in the absence of the 2005 Terms and Conditions, the 2004 Plan and 2005 Plan would bar his claims for commissions based on conversions after plaintiff's terminated ended.  However, plaintiff contends that the 2005 Terms and Conditions significantly altered the rights of Area Vice Presidents to receive commissions after they no longer participated in the 2004 and 2005 Plans.

Plaintiff asserts that the 2005 Terms and Conditions document provides for commission payments on all "closed orders". Plaintiff construes closed order to mean all sales which have resulted in signed contracts and contends that this provision does not require a client to convert the product for the commission to be earned.  Moreover, plaintiff contends that "earned activity" within the meaning of the 2005 Terms and Conditions refers to the final paragraph of the Change of

-12-

Employment section, which states that commissions due to the employee will be "paid as soon as monies are collected from the client".

Plaintiff argues that defendant's construction of the 2005 Terms and Conditions is self-contradictory in that if no payments will be made after an employee's effective termination date, plaintiff could not receive any commissions, even those to which both parties agree he was entitled.  Moreover, plaintiff asserts that defendant's construction of 2005 Terms and Conditions fails to give meaning to the charge-back provisions contained in the Change of Employment section.

Finally, plaintiff contends that the applicable provisions of the 2005 Terms and Conditions, if not plain on their face, are ambiguous.  Plaintiff asserts that the construction of ambiguous terms is left to the trier of fact, and, the court should apply the general rule that ambiguities are construed against the draftsman of an agreement.

<u>STANDARD OF REVIEW</u>

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); <u>Anderson v. Liberty</u>

-13-

Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Federal Home Loan Mortgage Corporation v. Scottsdale Insurance Company, 316 F.3d 431, 433 (3d Cir. 2003).  Only facts that may affect the outcome of a case are "material".  Moreover, all reasonable inferences from the record are drawn in favor of the non-movant.  Anderson, supra.

        Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof.  Watson v. Eastman Kodak Company, 235 F.3d 851, 858 (3d Cir. 2000).  A plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in his favor. Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa. 1995).

                                DISCUSSION

        Under the Pennsylvania common law of contracts,[11] "a writing must be interpreted as a whole, giving effect to all its provisions."  Atlantic Richfield Company v. Razumic, 480 Pa. 366, 372, 390 A.2d 736, 739 (1978).  "Where several instruments are

---

        [11]    Both parties have relied upon Commonwealth of Pennsylvania's common law of contracts in their briefs.  Accordingly, I need not engage in a choice of law analysis.  Brentwood Industries, Inc. v. Entex Technologies, Inc., Civ.A.No. 04-CV-3892 2005 WL 757189, at *13 (E.D.Pa. March 31, 2005).

made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." Huegel v. Mifflin Construction Company, Inc., 796 A.2d 350, 354-355 (Pa.Super. 2002)(internal citation and quotations omitted).

A court may not interpret one aspect of a contract in a manner that annuls another part of the contract. Meeting House Lane, Ltd. v. Melso, 628 A.2d 854, 857-858 (Pa.Super. 1993). Moreover, "[i]t is well settled that before a court may interpret a contract in such a way as to reach an absurd result, it must endeavor to reach an interpretation that is reasonable in light of the parties' intentions." Empire Sanitary Landfill, Inc. v. Riverside School District, 739 A.2d 651, 655 (Pa.Commw. 1999) (citing Pocono Manor Association v. Allen, 337 Pa. 442, 12 A.2d 32 (1940)).

"The intent of the parties to a written contract is deemed to be in the writing itself, and when the words are clear and unambiguous the intent is to be gleaned exclusively from the express language of the agreement". Delaware County v. Delaware County Prison Employees Independent Union, 552 Pa. 184, 189, 713 A.2d 1135, 1137 (1998)(internal citation omitted). "[T]he focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently

intended." <u>Steuart v. McChesney</u>, 498 Pa. 45, 49, 444 A.2d 659, 661 (1982)(emphasis in original).

In order to construe the meaning of a contract under Pennsylvania common law, the court must make a threshold determination whether the contract contains an ambiguity. <u>Steuart</u>, <u>supra</u>.  The court interprets, as a matter of law, the terms of the contract insofar as they are clear.  The court also determines the existence of any ambiguity.

If an ambiguity is found, "the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact." <u>Hutchison v. Sunbeam Coal Corporation</u>, 513 Pa. 192, 201, 519 A.2d 385, 390 (1986).  As a general rule, where the language of a contract is ambiguous and two logical interpretations of the provision are offered, the ambiguous provision is construed against the drafting party.  <u>Profit Wize Marketing v. Wiest</u>, 812 A.2d 1270, 1274 (Pa.Super. 2002).

Pennsylvania law defines a contract as "ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." <u>Kripp v. Kripp</u>, 578 Pa. 82, 91, 849 A.2d 1159, 1163 (2004).  To determine the existence of ambiguity, the court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that

meaning." <u>Mellon Bank, N.A. v. Aetna Business Credit, Inc.</u>, 619 F.2d 1001, 1011 (3d Cir. 1980).  The disagreement of the parties regarding the proper construction of an agreement does not alone render an agreement ambiguous.  <u>Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 93 (3d Cir. 2001)(Becker, C.J.).

Pennsylvania law recognizes both patent and latent ambiguities.  A patent ambiguity is created by the language of the instrument and appears on its face.  <u>Insurance Adjustment Bureau</u>, <u>supra</u>.  A latent ambiguity arises from "extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." <u>Bohler-Uddeholm America, Inc.</u>, 247 F.3d at 93 (reviewing Pennsylvania contract law).

A latent ambiguity may also arise "through silence or indefiniteness of expression." <u>Crown, Cork & Seal Company, Inc. v. Employers Insurance of Wausau</u>, Civ.A.No. 99-4904, 2002 WL 31164702, at *2 n.1 (E.D.Pa. September 27, 2002)(Waldman, J.). Finally, a latent ambiguity may arise "when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome." <u>Bohler-Uddeholm America, Inc.</u>, 247 F.3d at 96.

Applying the foregoing principles to this matter, I find that the parties have presented plausible alternative

interpretations of the contracts that are well-grounded in the text.  Moreover, I conclude that the contracts contain a number of patent and latent ambiguities which must be resolved by the trier of fact.

As a preliminary matter, within the 2004 Plan, 2005 Plan and 2005 Terms and Conditions, there is a patent ambiguity. Neither plan defines the term "closed order".  One reasonable construction of this term would include only sales contracts which were signed.  However, the term could also be reasonably understood to encompass signed accounts and their subsequent conversions.  Thus, the term is facially ambiguous.

Turning to the provisions of the 2005 Terms and Conditions, there is a patent ambiguity within this contract when construed in conjunction with the 2004 Plan and 2005 Plan.  The 2005 Terms and Conditions contain the following provision:  "Any commissions due to the employee will be paid as soon as monies are collected from the client."

This statement directly contradicts the earlier statement that "Commission payments will be sent to former employee on the 30th of the month following the earned activity". Moreover, under either the 2004 Plan or 2005 Plan, it is undisputed (as well as unambiguous) that the two possible earned activities are the signing of a sales contract or client

conversion.  Neither earned activity is contingent upon client payments.

One possible resolution of this ambiguity is that once an employee's employment is terminated, defendant need only pay plaintiff for his earned commissions (those related to prior signed sales agreements) on the 30th of the month following receipt of client payments.  However, an equally plausible resolution is that when defendant receives payments for client conversions, defendant must pay plaintiff his remaining 50% conversion commission (if closed orders includes such conversion commissions).

Moreover, I find that there is a latent ambiguity concerning which documents govern plaintiff's commission claims. The 2005 Terms and Conditions is incorporated by reference into the 2005 Plan.  However, as between the 2005 Plan and 2005 Terms and Conditions, there is an ambiguity concerning which document controls if the two documents are inconsistent.

A reasonable construction would be that the 2005 Terms and Conditions document controls, because it is referenced as containing additional "details" regarding commissions in the event of employment termination.  However, an equally reasonable construction is that the 2005 Plan, as the main or master document, controls.  This ambiguity regarding which contract governs is particularly significant because the 2005 Plan refers

-19-

to the "status" of the "closed orders" on the effective "termination date", whereas the 2005 Terms and Conditions only refers to "closed orders" without regard to their status.

Furthermore, there is a latent ambiguity concerning whether the 2004 Plan or 2005 Plan governs the claims for commissions for the two 2004 calendar year accounts (the SRP Federal Credit Union and Members Plus Credit Union accounts). The 2005 Plan and 2005 Terms and Conditions are silent with regard to whether they supersede the 2004 Plan with regard to commission payment calculations in the event of employee termination.  The 2004 Plan also does not contain a provision regarding superseding plans or expiration.  Thus, there is a genuine issue of material fact concerning which agreements govern which claims.

Accordingly, I conclude that there are numerous patent and latent ambiguities within the 2004 Plan, 2005 Plan and 2005 Terms and Conditions concerning plaintiff's entitlement to conversion commissions which must be resolved by the trier of fact.  Accordingly, defendant's motion for summary judgment is denied because there are genuine issues of material fact.

<u>CONCLUSION</u>

For all the foregoing reasons I deny the Motion of Defendant Open Solutions Inc. for Summary Judgement Under Federal Rule of Civil Procedure 56(c).